IN THE

## SUPREME COURT OF JUDICATURE,

OF THE

## STATE OF NEW JERSEY

### AT MAY TERM, 1835.

STEPHEN YOUNGS v. WILLIAM LITTLE AND JOHN S. LITTLE.

A promissory note made in New Jersey, payable "without defalcation or discount," has the same effect now, as a note in the usual form, had prior to the statute, *Rev. Laws*, 396, concerning promissory notes, and is in all respects to be governed and regulated by the same rules. Whereas, a note without those words in it, though a good promissory note, within the statute, for all other purposes, entitles the maker to be allowed all just off-sets and discounts, not only against the payee, but in the hands of any other holder, whether it was assigned before or after it came to maturity—provided such off-sets accrued before notice of the assignment.

This was a *certiorari* directed to the Common Pleas of the County of Morris. The facts and history of the case, are fully detailed in the opinions delivered.

*J. W. Miller* for plaintiff in *certiorari*.

*Sherrerd* for defendants.

HORNBLOWER, C. J. This action was brought by the defendants in *certiorari*, before a Justice of the Peace, against Youngs, the plaintiff in this court, on a promissory note given

by him to one Sarah Sweagle on the 22d of May 1826, for seventy dollars payable to her, or order, twelve months thereafter, *without defalcation or discount.* At the time of giving the note, she gave him a receipt, acknowledging that it was in full for her character and maintaining her child, of which Youngs was the reputed father; promising to give him security against any further claims on account of the matter, and concluding with these words: " If I refuse to give the security, said Youngs is not to pay the note." Sarah Sweagle afterward married one Miller, and on the 9th of February 1833, nearly six years after the note had become due, he assigned it, by a special endorsement to one Pownal, without recourse to him, Miller. On the 15th of April 1833, Pownal assigned the note to W. Little and J. S. Little, the plaintiffs below. The Justice gave judgment for the plaintiffs, and that judgment was affirmed by the Common Pleas. It is admitted that no consideration for the note, was paid by Pownal to Miller, but it was agreed between them that if Pownal should succeed in collecting the note, he was to have part of the money for his trouble, and pay over the rest to Miller.

The defendant offered in evidence on the trial below, the receipt and agreement before mentioned, signed by Sarah Sweagle, having first proved her signature thereto, by the subscribing witness; but the Court of Common Pleas on the appeal, as well as the Justice on the original trial, rejected the evidence, on the ground that the note was payable " without defalcation or discount," and that therefore the plaintiffs were entitled to recover, notwithstanding Sarah Sweagle had never given or tendered to the defendant, the security provided for in the agreement.

If the action had been brought by Sarah Sweagle herself, the evidence would certainly have been admissible. The note and the writing offered in evidence, were made at the same time, and were parts of one and the same agreement, and by the very terms of it he was not to pay the note, unless she gave the stipulated security. If she had been plaintiff, she must therefore have shown on the trial, that she had given, or was then ready to give the security; for, as between her and Youngs, the effect of

the agreement, was the same as it would have been, if the condition had been inserted in the note itself. On the other hand, it must be admitted, that if the note had been negotiated *before* its maturity, to an indorsee, for a valuable consideration and without notice, Youngs could not have availed himself of this defence, in an action at the suit of such indorsee. But in point of fact, the note did not pass out of the hands of the payee, until nearly six years after its maturity, nor even then, for a valuable consideration, and, if under such circumstances the maker is precluded from every just and equitable defence, which he might have set up in a suit between him and the payee, it must be by force of our statute concerning promissory notes. But is this so? Do the words " without defalcation or discount," shut out the maker of a note, from all just off-sets and every equitable defence, either against the payee himself or against an indorsee after maturity? Can such a note *never* be dishonored ; but will carry with it, not only its negotiability, but all its sacredness of character, as well after its maturity, as before? If so, then the proviso annexed to the *fourth Section* of our act, *Rev. Laws* 396, has subverted the whole system of the common law, in relation to promissory notes, and introduced a new and inconvenient rule : one, which if it comes to be understood and practised upon in its full extent, will be found to be exceedingly dangerous and demoralizing to the community. Banks may not discount them, after maturity, but brokers, and unfair dealers, with full notice, that the makers have a just and legal defence against such notes in the hands of the payees, or other holders, may purchase and speculate upon them, with perfect security. In short, if such is the effect of our statute, then, instead of placing promissory notes, as was done by the statute of 3 and 4 *Anne*, upon the same footing, as inland bills of exchange, it has made them very different securities, if not entirely destroyed their original character and usefulness. I am aware, while I make these remarks, that the influence of our statute in this particular, has undergone some discussion and has been supposed to have received a judicial determination. With great deference, however, to what has been intimated on the subject, I do not feel authorised in this

case, to repose myself upon the maxim "*stare decisis.*"—The inference which has been drawn from the case of *Coryell* v. *Croxall*, 2 *South. R.* 764, and what was said by this court, in *Tillou* v. *Britton*, 4 *Hals. R.* 120, cannot give the construction contended for by the counsel for the defendants in *certiorari*, the character and influence of decided and established principles. Upon looking into the case of *Coryell* v. *Croxall*, it will be found, rightly considered, not to involve this question. The plea and notice were properly stricken out, in that case, even if the note had not contained the words "without defalcation or discount." It was an attempt to plead payment, and claim an off-set, under the statute to enable *mutual* dealers to discount, *Rev. Laws*, 305, *Sections* 11 and 14, against a third person. This could not be done in any case ; a defendant can only plead payment and give notice of set-off, where there have been *mutual* dealings between *him* and the *plaintiff*, and where, if there is a balance due to the *defendant*, he can have judgment for it, *against the plaintiff*. *Wheeler* v. *Raymond*, 5 *Cowen R.* 231, 235 ; *Tuthill* v. *Bebee*, 8 *Johns. R.* 263 ; *Woolfe* v. *Washburne*, 6 *Cowen R.* 261 ; *Haxton* v. *Bishop*, 3 *Wend. R.* 18 *id.* 400. The relation of mutual dealers, did not exist between Coryell and Croxall ; but between Croxall and Le Grand ; how then could the parties proceed under that statute ? Suppose the defendant, on the trial, had proved Le Grand indebted to him in a sum exceeding the amount due on the note, what judgment could have been rendered ? Certainly, the defendant could not have had judgment against Coryell, for the balance due him from Le Grand. True, the plaintiff could not have recovered on the note against the defendant; but the account between the latter and Le Grand, would have remained open and unsettled, and must have been the subject matter of another suit. The defendant, therefore, instead of pleading payment, with a notice of off-set, ought to have pleaded the general issue, as was done in *Ruggles* v. *Keeler*, 3 *Johns. R.* 263, under which he might have proved, *not as payment or set-off*, but as an *equitable* defence, that he had paid the indorser, after the note became due, the money due thereon, in whole or in part ; or have set up any other equitable defence.

Suppose the statute relating to mutual dealers, had never been passed, how would a defendant, at the common law, have availed himself of the benefit of payments made to the payee, or indorser, after maturity, in an action on a note or bill of exchange, at the suit of an indorsee? Undoubtedly under the general issue; and so he must still; for the act to enable *mutual dealers* to discount, does not apply to his case; nor does the provision in our act concerning promissory notes, give him any such plea.

So too in the case of *Tillou* v. *Britton*, the question was not at all involved; and what was said about it, by the two Judges who decided that case, was entirely gratuitous. The note had actually been transferred by the Bank to Tillou, before its maturity. Upon any construction of the statute respecting promissory notes, that decision was right; for the mere fact, that the plaintiff took the note, knowing at the time, that the Bank was indebted to the maker, (which was the only point in the case,) did not vitiate the transaction or subject the note in the hands of the plaintiff to any off-set, or other equitable defence. If the note had been negotiated to the plaintiff, by the Bank, after it had come to maturity and been dishonored, then the case would have called for a solemn decision of the court, on the construction of the statute concerning promissory notes: But such was not the case.

It is only, therefore, from what was incidentally said by the court in *Tillou* v. *Britton*, that I dissent. The counsel for the plaintiff in that case cited, and the court seem, to have considered the decision in *Coryell* v. *Croxall*, as founded on the special character of the note, and as definitively settling the point, that no set-off or other equitable defence, could be made against such a note, in the hands of an indorsee, though taken by him after its maturity. This, I respectfully think, is a mistake. The reporter has not given us the reasons of the court, if they assigned any, for their decision; but if they struck out the plea and notice, upon the ground assumed, I can only say, they gave a very unfortunate reason, for a very correct judgment. The plea and notice were clearly inadmissible, upon the ground I have already mentioned; and it is obvious to remark, that in *Tillou* v. *Britton*, the court did not stop to

consider and settle the question, but assumed it as a point already settled in the former case. Not finding myself, therefore, concluded, by any direct and solemn decision on this matter, I feel it my duty to adopt such a construction of the statute, as shall be consistent with first principles, and yet in perfect accordance with the spirit and letter of the law. In 1799, when the act in question was passed, and long prior to that period, the general principles of law, by which promissory notes were governed; the nature and the extent of the contract created by them, and the rights, duties and obligations of all the parties to such instruments, were well settled by a long course of decisions, and well understood in the mercantile world. They had, by the usage of merchants, and the decisions of courts, acquired all the sanctity of character, and force of obligation, that the convenience of trade, and the security of parties, had been found, by long experience, to require. We cannot therefore suppose, it was the intention of Judge Paterson when he drew the act in question, situated as we were, between two great commercial cities, to throw the trading community into confusion, by changing the whole character of promissory notes, and the rights and liabilities of parties to them Such an imputation would be an act of injustice to the memory of that great man, so deservedly venerated for his sound discretion and profound learning as a jurist. On the contrary, I have always understood, the first clause of the proviso in the *fourth Section*, was the handy-work of some other person. Promissory notes in the usual and mercantile form, had begun to be pretty extensively used among our farmers and mechanics, but without very well understanding their nature and binding influence. They were considered in the community as mere evidences of debt, and seldom passed out of the hands into which they were first delivered. With a view, therefore, to protect that portion of society, who were unacquainted with the mercantile use of promissory notes, against the danger of being compelled to pay them a second time, in the hands of an indorsee, the first branch of the proviso clause, was no doubt introduced into the statute, whereby it is enacted that the plaintiff should allow all just set-offs and discounts not only

against himself, but against the assignor or assignors of such note, if such matter of set-off and discount, arose before notice of the assignment. Now it is perfectly plain, that if the proviso clause had terminated here, then *all* promissory notes would have been subject to set-offs; and instead of being placed by the statute, on the same footing as inland bills of exchange, they would have been rendered very unlike them; and must have ceased entirely, to be used as mercantile and negotiable instruments. But this was not the design of the statute, nor the intention of the Legislature. They therefore excepted out of the *general rule* created by the proviso, and restored to the original character of promissory notes, all such as should be drawn payable " without defalcation or discount." It is as I apprehend, as if the Legislature had enacted, that all promissory notes, made payable *without defalcation or discount,* should stand upon the same footing in *all* respects, as inland bills of exchange, but that all other promissory notes should be liable to all just set-offs and discounts. A mere perusal of the act, in reference to the subject matter of Legislation, inevitably leads to this construction. The *fourth Section,* with a few unimportant variations, is a copy of 3 and 4 *Anne.* The design and effect of that statute, was to put promissory notes, on the footing of inland bills of exchange. Had our legislature omitted the proviso clause, such would have been the whole operation of our act; but influenced by the considerations I have already mentioned, or for some other reason, they thought proper to introduce the clause under examination. They did not mean to abolish promissory notes, properly so called, and create two new species of such securities; one that should be *less* available, and another that should carry with it, *greater credit,* and be of stronger obligation than the original instrument. The whole clause taken together, enacts in substance, that promissory notes shall be liable, to set-offs and discounts, as well against the plaintiff, as against the assignor, " *unless* " they are made payable without defalcation or discount. But, if so made payable, what then? Why, the argument on the other side, is, that then, they are not to be liable to any off-sets or discounts, under any circumstances—*not even for debts due*

*from the plaintiff himself.* There is no stopping short of this monstrous absurdity; for if the " unless," the exception in the statute, is to be understood as affirming the reverse of the *general rule*, out of which the case is excepted, and as subjecting the excepted case, to precisely the *opposite rule*, then the consequence inevitably follows, that a defendant must pay his note, though the plaintiff may owe him more than the amount of it. This result will appear at once, if we reduce to writing, what is supposed to be implied by the exception. The general rule expressed in the proviso, is " that the plaintiff shall allow all just set-offs and discounts, as well *against himself*, as against the "assignor, &c." The converse of this would be, " that if the note is payable without defalcation or discount, then the plaintiff *shall not* be obliged to allow any just set-offs or discounts, *either as against himself*, or against the assignor, &c." But this is neither the language, nor the meaning of the act. The Legislature have indeed, changed the form of mercantile, negotiable notes, but they have not abrogated the law governing that species of security. They have apprised the community that " unless " the words " without defalcation or discount " are inserted in the instrument, *it* shall not carry with it all the credit and security, which the common law had attached to promissory notes, in the usual form ; but that promissory notes, containing that clause, should continue to be, what promissory notes had been, in the commercial world. So that now, a note made in New Jersey, payable " without defalcation or discount," is just what a promissory note without those words, is in England, and among merchants in the city of New York. In other words, a note, made in New Jersey, payable " without defalcation or discount," has the same effect now, as a note in the usual form, had prior to the statute, and is in all respects to be governed and regulated by the same rules. *Whereas* a note without those words in it, though a good promissory note, within the statute, for all other purposes, entitles the maker, to be allowed all just off-sets and discounts, not only against the payee, but in the hands of any other holder, whether it was assigned before or after it came to maturity—provided such off-sets accrued, before notice of the assignment.

This construction fully effectuates the plain intent of the Legislature; preserves the original character and design of these instruments, and leaves ·undisturbed, the just and equitable principles by which they are governed. If a man intends to give a promissory note which shall be considered and treated as such, in all its operations, by merchants, banks, and courts, he will make it payable without defalcation or discount. If otherwise, he wishes to reserve to himself, the benefit of any claim he has or may have against the payee, he will give it in the common form—a departure from this construction, prostrates all established rules and principles relating to promissory notes, and opens a wide door for fraud and injustice.

I am therefore of opinion, in the case before us, the court erred in excluding the evidence offered by the defendant below; and consequently, the judgment ought to be reversed.

Ford, J. Stephen Youngs made a note bearing date the 22d May, 1826, promising to pay to Sarah Sweagle or order, seventy dollars in twelve months, without defalcation or discount. Not being paid at the day, nor till almost six years thereafter had elapsed, on the 9th of February, 1833, John B. B. Miller, the husband, subsequently, of Sarah Sweagle, assigned it to Henry Pownal. If he collected the money, they agreed that he should keep part of it for his trouble, and pay the rest to Miller. Pownal afterwards assigned it to John S. Little and William Little, who sued Stephen Youngs the maker, and recovered judgment for the amount before a Justice, which judgment was afterwards affirmed in the Common Pleas on appeal. There are several errors alleged in the proceedings of the court.

1. By a separate agreement, under the hand of Sarah Sweagle, bearing even date with the note, she certifies that it is given to her, for her character, and for maintaining a child that she had by him; and she promised, upon the payment of the money, to give him security that he should never be called upon for the maintenance of the child. It concludes in these words—" and if I refuse to give him security, said Youngs is not to pay the note." Youngs offered in evidence, this agreement, in bar of the action, insisting that he could not be made liable, until such security was given or tendered. But the court held, that

this agreement between the assignor and the maker, could not be set up against the assignee, who was not privy to it, for the note was made payable without defalcation or discount, and the assignee had a right to repose on that promise, by the express words of the statute. I am of opinion that their decision was right under the proviso in the *fourth Section* of the act concerning promissory notes, *Rev. Laws* 396, and that it was conformable to two cases solemnly declared at the bar of this court.

It was right according to the proviso in the *fourth Section* of the act. It is suggested, this proviso was the handy work of some member of the Legislature, after the law had been carefully drawn and reported. This is a mistake. The law was drawn nearly verbatim with the 3 and 4 *Anne, ch.* 9; to which this proviso was annexed, by that eminent jurist, who reported the British statutes for enactment; except the last three lines beginning with the word " *unless.*" He evidently meant that the assignment of notes, should be governed by the same rules as the assignment of bonds. He made the provisions literally the same. His reason probably was, that the great body of the people made use of promissory notes only as evidence of debt, and had no general knowledge of the custom of merchants concerning them. A member of the Legislative Council, who held also a high judicial station, perceiving that promissory notes could never serve the ends of trade and commerce, under this proviso, without some amendment, proposed the *nisi* clause beginning with the word " unless," and it passed. Thus amended, the proviso runs in these words—" Provided always, that the said plaintiff or plaintiffs shall allow all just *set-offs* and *discounts*, not only against himself, but against the assignor or assignors of such note, before notice of such assignment shall have been *given to the defendant or defendants*, UNLESS it shall be *expressed* in the said note, that the said sum therein mentioned, shall be paid without defalcation or discount."

This proviso gives a right of set-offs against *an assigned note*, the same as against an *assigned bond*, the words being the *same* in both statutes, without any regard to the assignments, being made before or after the instruments become due; *unless* the note expresses that the money shall be paid without defal

cation or discount; and if it does, the word "unless" forms an exception commensurate with the grant itself; the right of set-offs is taken away just as it was given, that is, without any regard to the assignment being made before or after the instru-ment became due. It is as if land should be devised to a man, and to his heirs, *unless* he should be in Europe at the death of the testator; if he be so at that time, the word "unless" forms an exception to the whole of the devise, so that he can neither take in fee nor for life. So here, set-offs are given *in all cases of assignment*, both before and after due, unless the clause in question be inserted, and when inserted, it is taken away *in all cases*, both before or after due, just *as broadly* as it was *given*. Therefore the words of the proviso, in themselves, are con-clusive on the point.

By the mercantile law, if a note be not assigned till after it becomes due, it may be assailed by all equities and set-offs that existed between the original parties, though the holder may have known nothing of them at the time he took the note; but that part of the mercantile law, has ceased by force of this statute, if the note be made payable without defalcation or discount. The power of the legislature to make this alteration, cannot be questioned.

The proviso permits the maker of a note, to deprive himself of all set-offs, discounts and equities, provided he will *waive* them by a special agreement inserted in the body of the note. But after the waiver has been solemnly made and published, with every negotiation of the note from hand to hand, and holder to holder, an effort to diminish or prune the sum, by any collateral means, savors strongly of moral deceit and perfidy. If Sarah Sweagle does not give the promised security, she becomes liable for a breach of contract; but it is mere wanton-ness in him on that account, to violate his own faith, after having allured the holder by it, to take the note at full value. It has no analogy to a note under the statute of *Anne*, which by non-payment at the day appointed, becomes *dishonored* and liable to all equities between the original parties; whereas a note made under our statute, cannot be dishonored by exposure to equities or set-offs, inasmuch, as if any exist, they are

expressly waived under the hand of the maker, by a living waiver that runs with the instrument, and is renewed every time it is negotiated from one hand to another. Therefore, an attempt to diminish the sum by any kind of equity or defalcation, must be perfidious, and consequently, odious to a court of justice.

But breach of faith, however odious, is not the worst aspect of the case—it desecrates the sacredness of a contract. An agreement for valuable consideration, to pay a stipulated sum without defalcation or discount, is a contract in the strictest acceptation of the term. It is not one *implied* from circumstances, and liable to be moulded as they may vary; but an *express contract* which the court is so far from having power to mould and adjust to the conveniences of trade and commerce, that they are to hold the obligation of it sacred, and inforce it as it is; they neither have, nor ought to have the power to impair it; and therefore to allow a defalcation, for equities between other persons, to operate against an innocent holder, in the face of a special agreement to the contrary, would be to exercise a judicial power over a contract, to say the least of it dangerous, and not saying too much of it, to call it unconstitutional; for the sacredness and integrity of contracts, lie at the foundation of our government.

It is said that if all set-offs are prohibited, the words of the statute might prevent the maker from setting off money owing to him, by the plaintiff himself; but this is fallacious. If the defendant's money is already in the plaintiff's hands an appropriation of it *to the note*, is as much *payment*, as if he took it out of his purse; common sense calls it payment; it is so, among merchants in their daily transactions; the law calls it so, and allows it to be so pleaded. The plaintiff has so much of the defendant's money *in hand*, and if he gets the whole amount of the note in addition to it, he will be overpaid. The puerility of recovering the money from the plaintiff, in order to hand it back to him, would be nothing more than a farce, if it were not, that the costs might make both parties too serious for mirth.

That a note promising to pay without defalcation or discount,

includes all set-offs of the maker, against *the assignor or assignors*, though at one time doubted, was soon settled by the decisions of this court, if the rule *stare decisis* be of any avail, inasmuch as it has been twice decided at bar. This is neither the first nor second time that it has come before the court. A stronger case, or one more immediately on the point, cannot be imagined than that of *Coryell* v. *Croxall*, 2 *South.* 764, before the time indeed of the present judges, but nevertheless before a very able bench. Thomas Croxall made his note for $250, to one Le Grand, or order, payable at a certain day, without defalcation or discount. After the day appointed for payment had elapsed, Le Grand assigned it to Daniel Coryell, the plaintiff, who brought an action on it against Thomas Croxall, the maker. The defendant pleaded payment to Le Grand, after the money had become due, and before he had any notice of the assignment. He also gave notice, that Le Grand had received goods of him to the amount of $250; that he had paid money to the use of Le Grand, at his request, to third persons, and that he should *set-off* these monies, against the note in the hands of the holder of it. A stronger defence could not have been set up, under the statute of *Anne*, and the custom of merchants. But the proviso in our statute being cited and read, the court said unanimously, " let the plea and notice be struck off the files." Thus a set-off against the assignor, where the note was payable without defalcation or discount, was promptly over-ruled. It is said that the decision would have been the same, if the note had *not been* payable without defalcation or discount; that the account offered to be set-off, was not an account against the plaintiff in the action, that it was an account against a *third person*, which is never allowed, under the act enabling *mutual dealers* to set-off. Now I grant that it would not be allowed under the act concerning *mutual dealers*, but it could not have been refused under the proviso in the act we are now considering. It is *this* act which says that the plaintiff *shall* allow all just set-offs and discounts, not only against himself, but against the *assignor* of the note, unless it be made payable without defalcation or discount. So the proviso would have legalized Croxall's set-offs, *by the very name of set-off*, if the note had

*not been* payable without defalcation or discount. The plea of set-off, could not have been refused under this proviso, (without recurring to the statute concerning mutual dealers,) if the note had not been payable without defalcation or discount. The decision rests on this very point. It was so understood by the counsel who advocated that plea, and who would not have suffered the defence to be lost, if an amendment could have let it in. It was not offered under the statute enabling mutual dealers to discount, but under the act concerning promissory notes, and on the very ground now taken by the maker of this note, of its having been negotiated after it became payable. But the court considered that as making no difference, where the promise was to pay without defalcation or discount.

The case thus decided, became a leading one in New Jersey, and the two Justices who sat long afterward, in that of *Tillou* v. *Britton*, 4 *Halst.* 120, refused the maker's set-off against the *assignor* of the note, because, among other reasons, it was drawn without defalcation or discount. They recognized the case of *Coryell* v. *Croxall* as sound law. The language of Drake, J. is explicit; his words are: "whether the note was endorsed before or after due, does not appear to be material, *as it contains the words without defalcation or discount.*" The opinion of the Court of Common Pleas, being conformable to these plain decisions and to the statute itself, I cannot agree to reverse their proceedings on this ground.

2. The next reason assigned is, that they over-ruled legal evidence. It was alleged that the note was obtained from the defendant, by duress of imprisonment. A witness was asked whether he, as a Constable, did not have the defendant in custody, at the time of his signing this note. An objection was made to the question, and it was over-ruled; for it showed no duress if true. Had such custody been by the instigation or procurement of Sarah Sweagle and without any legal warrant, it would have been admissible; but no such question was proposed.

3. The title to the note, is alleged not to have been in Sarah Sweagle, for she had assigned it to one Munson, before it was assigned to the plaintiffs, and Munson had not re-assigned it to

her or her husband.  If an assignee fail to receive the money of the maker, he may resort back to the assignor, and if he take it up, as it appears he did, by having it again in his possession, no re-assignment is necessary.  *Boylan* v. *Vighte*, 1 *Pen.* 95. He had a right to strike out the assignment to Munson.—This he did, by pasting over it, a piece of paper; it was the same thing as striking it out, if done with that intent.  The decision of the court below, shews that they understood it to be done with that intent, and this court cannot say to the contrary.—We must take the facts as they were taken in the court below.

Let the judgment be affirmed.

RYERSON, J.  In this case the question seems to be fairly raised, what is the legal effect of the words " without defalcation or discount," introduced in the fourth section of our statute concerning promissory notes, *Revised Laws* 395-6.  The body of that section, seems to be a substantial copy of the English statute on that subject.  To the section, is then appended a proviso, " that the plaintiff shall allow all just set-offs or discounts, not only against himself, but against the assignor of such note, before notice of such assignment shall have been given to the defendant—unless it shall be expressed in the said note, that the said sum therein mentioned, shall be paid without defalcation or discount."

The body of the section then, prescribes no new rule.  The proviso does.  But this proviso contains an exception embodied in the words begining with " unless," &c.  The simple and only office, as it appears to me, of this closing member of the proviso is, to exclude altogether, the notes therein mentioned, from the operation of the proviso.  *Unless*, in the position in which it stands, has the same force as *except*, and the meaning of the whole member is the same, as if the Legislature had said, " excepting from the operation of this proviso, such notes as are drawn payable without defalcation or discount."  That is, leaving the notes containing those words, just where they were before, under the statute of *Anne*.  Thus we have preserved to us, the well known commercial instrument with all its proper- ties, as ascertained and established by a long course of decision, at the same time that another security or evidence of debt, by

Youngs *v.* Little and Little.

law transferable, is provided for that part of the community, who have no occasion to deal with a strictly commercial instrument. It may be further observed, that the proviso of the statute in question, does not say at all what *shall be,* the legal operation or effect of a note containing the words " without defalcation or discount." It does not say that such note shall be paid at all times, or under all circumstances, without set-off as against the assignor—or in any other manner. The construction to my mind therefore is inevitable, that such note is of just such force and effect, as it would have been without the words in question, if the proviso and excepting clause had never existed, but the section ended where the proviso begins.

I have thus given in as few words as possible, my view of the intent and meaning of the statute in question. But at least one of the counsel who argued this case, seems to have taken it for granted, that a different construction was adopted and settled by this court, in the cases of *Coryell* v. *Croxall* and *Tillou* v. *Britton.* Before these cases were reported, I did not entertain a doubt, that the true meaning of the statute was, as I have above supposed. I had more than once heard it discussed, and had occasion, professionally to examine the question. When the first case was given to the public, it did not satisfy my judgment, that the law was otherwise than supposed. The court granted the rule applied for, without telling us what the law was on the subject, or why they thought it so. We can therefore derive very little aid from that case, to direct us to a correct result. More especially, as none of the present members of the court, at that time, participated in its decisions. In the last case of *Tillou* v. *Britton,* one of the only two Judges who heard the argument and gave opinions, seems to have intended merely to state the conclusion which might be drawn from the former decision, without any inquiry, or deeming it *necessary* to *make* any inquiry into its correctness. I do not therefore perceive any such solemn and conclusive decision of the point in question, as ought to preclude us from expressing *our own* opinions on the construction of the statute, or to yield the conviction of our own minds, to the weight of authority.

The defence, therefore, which was offered by the defendant

below, the plaintiff in this court, was, according to a settled course of adjudication respecting notes negotiated after due, improperly excluded by the Court of Common Pleas, and their judgment ought to be *reversed*

*Judgment Reversed.*

CITED in *Cumberland Bank* v. *Hann*, 3 *Harr.* 224 ; *Receivers* v. *Paterson Gas Light Co.*, 3 *Zab.* 298–305.